

I N T H E

# Court of Appeals of Indiana

Bruce Mendenhall,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff*



FILED

Mar 13 2026, 8:31 am

C L E R K
Indiana Supreme Court
Court of Appeals
and Tax Court

---

March 12, 2026

Court of Appeals Case No.
25A-CR-775

Appeal from the Marion Superior Court

The Honorable Angela Dow Davis, Judge

Trial Court Cause No.
49D27-0804-MR-77498

---

**Opinion by Judge Vaidik**
Judges Bradford and Altice concur.

## Case Summary

In 2007, Bruce Mendenhall was stopped by a Tennessee police officer at a truck stop in Nashville and consented to a search of his semi-truck. The officer found bloody women's clothes and transported Mendenhall to a police station, where he admitted that he had picked up a woman at an Indianapolis truck stop the night before and that she had been shot in the head with his rifle. Mendenhall also admitted that he had driven south on I-65 from Indianapolis to Nashville. The woman was eventually identified as Carma Purpura from Indianapolis. In 2008, the State of Indiana charged Mendenhall with Purpura's murder in Marion County. The case was still pending when, several years later, Purpura's remains were found in southern Kentucky near I-65.

The State paused its prosecution of Mendenhall in Indiana while he was tried in Tennessee for the deaths of two additional women and sentenced to two life sentences. In 2021, the State resumed its prosecution, and Mendenhall was convicted of murder. Mendenhall now appeals, arguing that (1) the evidence is insufficient to establish that Indiana has territorial jurisdiction (i.e., that the murder occurred in Indiana) and (2) the trial court erred in admitting evidence stemming from the search of his semi-truck in Tennessee because he was in custody but not advised of his right to consult with an attorney before consenting to the search, which *Pirtle v. State*, 323 N.E.2d 634 (Ind. 1975), requires.

[3] We conclude that the evidence is sufficient to prove territorial jurisdiction because a reasonable inference from the evidence is that Mendenhall killed Purpura at the truck stop in Indianapolis and didn't keep her captive and alive as he drove south on I-65. In addition, we conclude that the trial court did not err in admitting evidence stemming from the Tennessee search. Accordingly, we affirm the trial court.

## Facts and Procedural History

[4] In July 2007, Detective Sergeant Pat Postiglione, a homicide detective with the Metropolitan Nashville Police Department in Nashville, Tennessee, was investigating a matter involving Truck Stops of America on North 1st Street in Nashville. As part of his investigation, he had been reviewing security-camera footage of semi-trucks coming and going from that location. A semi-truck with a yellow tractor caught his attention as "a suspect or a witness." Tr. Vol. 3 p. 137.

[5] Around 10:00 a.m. on July 12, Sergeant Postiglione went to Truck Stops of America "to get on the street and see what [he was] seeing" on the video. *Id.* While there, he saw a semi-truck with a yellow tractor that "looked similar to the tractor that [he] had observed on the video" pull in. *Id.* Sergeant Postiglione watched as the semi-truck parked "nose first," even though semi-trucks normally back in. *Id.* at 138. Sergeant Postiglione "pulled up behind" the semi-truck, exited his car, and walked up to the truck. *Id.* at 173. As he did, the person inside, later identified as Mendenhall, "pulled the curtain [to the sleeper

compartment] shut." *Id.* at 138. Sergeant Postiglione "banged" on the door, identified himself, and asked Mendenhall to step outside to speak to him. *Id.* Ten seconds later, the curtain opened, and Mendenhall exited his semi-truck. *Id.* Mendenhall's shirt was open, he wasn't wearing any shoes, and he was stretching as if he had just been woken up. At that point, Sergeant Postiglione observed "several drops that appeared . . . to be blood" on the inside of the open driver's door. *Id.* at 139. Sergeant Postiglione asked Mendenhall if he could "look in his truck." *Id.* at 140. Mendenhall agreed and signed a consent-to-search form.

[6] Sergeant Postiglione started the search in the sleeper compartment of Mendenhall's semi-truck and "immediately noticed a large bag." *Id.* at 141. He opened it and saw women's clothes, women's shoes, and rags, "all blood soaked" with "fresh" blood. *Id.* at 141-42. Sergeant Postiglione picked up the bag, which was "fairly heavy" from the blood. *Id.* at 142. He asked Mendenhall about the blood, and Mendenhall said it was from cutting his leg getting in and out of his truck. Sergeant Postiglione asked Mendenhall to show him his leg, and when he did, there was "nothing there." *Id.* at 143. Sergeant Postiglione then asked him about the clothes, and he said they belonged to his wife or daughter. Sergeant Postiglione transported Mendenhall to the homicide office for an interview.

[7] Mendenhall signed a waiver of *Miranda* rights and spoke to Sergeant Postiglione. He said a woman had entered his semi-truck the night before, July 11, at the Flying J truck stop in Indianapolis sometime between 8:00 and 9:30

p.m. The Flying J is near Harding Street and I-465 on the south side of Indianapolis in Marion County. Although the record doesn't say that Mendenhall expressly admitted shooting the woman, he did admit that she "was shot" in the head and that "there was a plastic bag over her head" and "[b]lack tape around [her] neck." *Id.* at 144. Sergeant Postiglione asked Mendenhall what the woman was shot with, and he said "his rifle," which was a .22 caliber rifle that was later recovered from his semi-truck. *Id.* Sergeant Postiglione then asked if there would be blood on the rifle, and Mendenhall said there "should be" and that it "would be from the girl from Indianapolis." *Id.* at 145. Sergeant Postiglione also asked Mendenhall if his fingerprints would be on the rifle, and he said "they should be" and that nobody else's fingerprints would be on it. *Id.*

[8] During the interview, Sergeant Postiglione noticed blood under Mendenhall's fingernails, which Mendenhall said was "from cleaning up from the girl from Indianapolis." *Id.* at 153. Contrary to his earlier statements, Mendenhall admitted that the bloody clothes did not belong to his wife or daughter but "the victim from Indianapolis." *Id.* at 153-54. Mendenhall said he used the rags to "wipe down the mattress and the floor" and then put them in the bag with the bloody clothes. *Id.* at 153. He also admitted that he had driven south on I-65 from Indianapolis to Nashville.

[9] The Tennessee police obtained a search warrant for Mendenhall's semi-truck. Inside the truck they recovered a spent shell casing from a .22 caliber rifle, the .22 caliber rifle Mendenhall told police was used in the shooting, an ATM card

belonging to Carma Purpura, who lived in Indianapolis, and ATM receipts from a gas station on North Capitol Avenue in Indianapolis showing that Purpura had tried to withdraw money at 6:19 p.m., 6:20 p.m., and 6:28 p.m. on July 11 but had "insufficient funds." *Id.* at 170; Ex. p. 55. The police also recovered Purpura's cell phone and a used condom and observed blood on the floor and the mattress. DNA testing later showed that the blood on the clothes was Purpura's and that both Mendenhall's and Purpura's DNA was on the condom.

[10] The Tennessee police called the Indianapolis Metropolitan Police Department to alert them about a possible shooting at the Flying J. The Indianapolis police searched the area around the Flying J for three days but didn't find a body. They recovered security-camera footage from the gas station on North Capitol Avenue in Indianapolis showing Purpura, wearing the same clothes found in Mendenhall's semi-truck, at 7:36 p.m. on July 11.

[11] In April 2008, Purpura's body still had not been found, but the State charged Mendenhall with her murder in Marion County. By then, Mendenhall was facing murder charges in two separate cases in Tennessee, and those cases were tried first. Mendenhall was eventually convicted of murder in the Tennessee cases and received two life sentences.[1]

---

[1] Mendenhall appealed his Tennessee murder convictions and sentences, and the Tennessee Court of Criminal Appeals affirmed. *See State v. Mendenhall*, No. M2018-02089-CCA-R3-CD, 2020 WL 2494479 (Tenn. Crim. App. May 14, 2020) (victim Symantha Winters); *State v. Mendenhall*, No. M2010-02080-CCA-R3-CD, 2013 WL 430329 (Tenn. Crim. App. Feb. 4, 2013) (victim Sara Hulbert). The Tennessee Supreme

[12] In August 2011, a Mammoth Cave employee was working near mile marker 8 on the Louie B. Nunn Parkway in southern Kentucky, which is close to I-65 and in between Indianapolis and Nashville, when he discovered a human skull. The skull was approximately 75 feet below the road in a steep, brushy, wooded area. The Kentucky State Police searched the area and located additional human skeletal remains.

[13] The bones were examined by a forensic anthropologist with the Kentucky Medical Examiner's Office. The forensic anthropologist determined that the person sustained a single gunshot wound to the head. The teeth from the skull were compared to dental records of local missing people, but there was no match. As a result, the forensic anthropologist sent two of the bones to the Center for Human Identification at the University of North Texas. There, the DNA was analyzed and entered into CODIS.[2] In October 2016, the DNA sample was matched to Purpura.

[14] The State resumed its prosecution of Mendenhall in 2021, and jury trial was set for January 2025. Before trial, Mendenhall moved to suppress the fruits of Sergeant Postiglione's July 12, 2007 search of his semi-truck in Tennessee, and

Court denied review in both cases. Mendenhall later sought post-conviction relief, which was also denied. No evidence of these murders was presented to the jury in this case.

[2] CODIS, which stands for the Combined DNA Index System, is a national database that stores DNA profiles.

a hearing was held.[3] Mendenhall argued that his consent to search in Tennessee was invalid under the Indiana Constitution because he was in custody but not advised of his right to consult with an attorney before consenting, which *Pirtle v. State*, 323 N.E.2d 634 (Ind. 1975), requires. In that case, the Indiana Supreme Court held "that a person who is asked to give consent to search while in police custody is entitled to the presence and advice of counsel prior to making the decision whether to give such consent." *Id.* at 640. Absent such a warning, any evidence recovered during the search is inadmissible. *Id.* The State responded that because the search was conducted in Tennessee, *Pirtle* did not apply. The trial court agreed and denied the motion to suppress. *See* Tr. Vol. 3 p. 29.[4]

[15] The case proceeded to jury trial, and Mendenhall objected to the admission of the evidence stemming from Sergeant Postiglione's search on the same grounds that were argued at the suppression hearing. After the State rested, Mendenhall moved for judgment on the evidence, arguing that the State failed to prove venue in Marion County by a preponderance of evidence. *See* Appellant's App. Vol. 2 pp. 163-66; *Cutter v. State*, 725 N.E.2d 401, 408 (Ind. 2000) ("The right to be tried in the county in which the offense was committed is a constitutional

---

[3] Mendenhall moved to suppress all the evidence recovered from his semi-truck, his buccal swab, and his statements to police. *See* Appellant's App. Vol. 2 pp. 123-24.

[4] The State also argued, and the trial court also found, that Mendenhall wasn't in custody when he consented to the search and therefore a *Pirtle* warning wasn't required. On appeal, Mendenhall argues that he was in custody. *See* Appellant's Br. p. 22. The State didn't respond to this argument in its brief. Because we reject Mendenhall's *Pirtle* claim for a different reason below, we do not address whether Mendenhall was in custody.

and a statutory right."), *reh'g denied*. The trial court denied the motion but said Mendenhall could argue venue during closing argument. *See* Tr. Vol. 4 pp. 56-57.

During closing argument, defense counsel argued that the State bore the burden of proving venue by a preponderance of the evidence but that it didn't present any evidence that Purpura was killed in Marion County. *See id.* at 65-66. Mendenhall didn't separately argue that the State failed to prove territorial jurisdiction (i.e., that the murder occurred in Indiana), and a jury instruction on territorial jurisdiction was neither requested nor given. The jury found Mendenhall guilty of murder, and the trial court sentenced him to 65 years, to be served consecutive to his two life sentences in Tennessee.

Mendenhall now appeals.[5]

## Discussion and Decision

### I. The evidence is sufficient to prove territorial jurisdiction

Mendenhall contends that the evidence is insufficient to establish that Indiana has territorial jurisdiction. Territorial jurisdiction, which is governed by Indiana Code section 35-41-1-1, is the authority of Indiana to prosecute a person for an act committed within its territorial boundaries. *Ortiz v. State*, 766 N.E.2d 370, 374 (Ind. 2002); *Riggle v. State*, 151 N.E.3d 766, 769 (Ind. Ct. App. 2020).

---

[5] We held oral argument on February 13, 2026, in the Indiana Supreme Court courtroom and hosted the interns for the Indiana General Assembly. We thank counsel for their helpful presentations.

"Although territorial jurisdiction is not necessarily thought of as an element of the offense, the State is required to prove it beyond a reasonable doubt." *Riggle*, 151 N.E.3d at 769.

[19] As an initial matter, we note that while the jury was told by defense counsel that the State had to prove venue in Marion County by a preponderance of the evidence, it was never instructed that the State had to prove territorial jurisdiction in Indiana beyond a reasonable doubt. But Mendenhall doesn't claim any error in this regard, e.g., he doesn't argue that the trial court committed fundamental error by not giving an instruction even without a request by the parties. In *Ortiz*, the Indiana Supreme Court addressed whether the trial court erred in not instructing the jury on territorial jurisdiction. The Court analyzed the issue under fundamental error because the defendant "failed to tender his own instruction." *Ortiz*, 766 N.E.2d at 375. The Court held that "if there is no serious evidentiary dispute that the trial court has territorial jurisdiction, then a special instruction on territorial jurisdiction need not be given to the jury." *Id.* at 376. The Court concluded that there was no fundamental error because "[n]ot only was there sufficient evidence to prove the [offenses] occurred in Indiana, but also [the defendant] never contested jurisdiction at trial." *Id*. The Court distinguished the case from *McKinney v. State*, 553 N.E.2d 860 (Ind. Ct. App. 1990), *trans. denied*. In that case, this Court reversed the defendant's murder conviction and remanded for a new trial because he disputed territorial jurisdiction at trial, and there was a dispute concerning whether the crime occurred in Ohio or Indiana, but the trial court

rejected his jury instruction on territorial jurisdiction. Because Mendenhall doesn't argue that the trial court committed fundamental error by not instructing the jury on territorial jurisdiction, we only address territorial jurisdiction in the context of sufficiency of the evidence.

[20] We review a claim that Indiana lacked territorial jurisdiction as we would any other sufficiency challenge. *Ortiz*, 766 N.E.2d at 374. Without reweighing the evidence or judging witness credibility, we consider only the probative evidence supporting the verdict and any reasonable inferences that may be drawn therefrom. *Id.* We will affirm if the evidence and inferences could have allowed a reasonable trier of fact to find that territorial jurisdiction existed. *Id.*

[21] "A person may be convicted under Indiana law of an offense if . . . either the **conduct** that is an element of the offense, the **result** that is an element, or both, occur in Indiana[.]" Ind. Code § 35-41-1-1(b)(1) (emphases added). When, as here, the offense is "homicide," "either the death of the victim or bodily impact causing death constitutes a result under subsection (b)(1). If the body of a homicide victim is found in Indiana, it is presumed that the result occurred in Indiana." *Id.* at (c).[6]

---

[6] Kentucky law is similar. *See* Ky. Rev. St. Ann. § 500.060(3) ("When the offense is homicide, either the death of the victim or the bodily impact causing death constitutes a 'result' within the meaning of subsection (1)(a). If the body of a homicide victim is found within this state, it shall be prima facie evidence that the result occurred within the state.").

Mendenhall admits that the evidence shows that Purpura entered his semi-truck in Indianapolis and that she was killed in his truck. *See* Appellant's Reply Br. p. 5 (admitting that the evidence shows that "Mendenhall met Purpura in Indianapolis" and that "she was killed in Mendenhall's truck"). But he asserts that "nothing establishes where [his] truck was when Purpura was killed." *Id.* Mendenhall acknowledges that Indiana and Kentucky were "possible sites of Purpura's murder"; however, he says that "none of the State's evidence tips the scales toward Indiana," much less establishes it beyond a reasonable doubt. *Id.* at 6. If anything, he says, the fact that Purpura's remains were found in Kentucky suggests that she was killed there.

The State responds that a reasonable inference from the evidence is that Purpura was killed in Indiana, not Kentucky. We agree. The evidence shows that Purpura lived in Indianapolis, and there was no indication that she intended to leave Indianapolis the night she was killed. Purpura's sister testified that she had spoken to Purpura on July 10, and "everything [was] fine." Tr. Vol. 3 p. 134. In addition, shortly before entering Mendenhall's semi-truck at the Flying J in Indianapolis, Purpura learned that she had no money. Mendenhall and Purpura then had sex as evidenced by the used condom with their DNA found in the truck. A reasonable inference from the evidence is that Purpura went to the truck stop to make some money, not to leave town, meaning that she wouldn't have willingly left the truck stop with Mendenhall, and that he killed her there rather than keeping her alive and captive for the

long drive south on I-65 to the Louie B. Nunn Parkway in southern Kentucky. The evidence is sufficient to prove that Indiana has territorial jurisdiction.[7, 8]

## II. The trial court did not err in admitting evidence stemming from the search of Mendenhall's semi-truck in Tennessee

[24] Mendenhall also contends that the trial court erred in admitting evidence stemming from the July 12, 2007 search of his semi-truck in Tennessee because he was in custody but not advised of his right to consult with an attorney before consenting, in violation of *Pirtle*.[9] We generally review the admission of evidence for an abuse of discretion. *McCoy v. State*, 193 N.E.3d 387, 391 (Ind. 2022). "However, when a constitutional violation is alleged, the proper

---

[7] Mendenhall cites *Sundling v. State*, 679 N.E.2d 988 (Ind. Ct. App. 1997), *reh'g denied*, but we find that case distinguishable. There, the defendant was charged with molesting two children from Michigan (A.W. and B.W.) at an Indiana motel. We reversed the defendant's conviction for one of the children (A.W.):

> An examination of the record reveals that there is no evidence that A.W. was molested by Sundling in Indiana. The State contends that the trial court relied upon B.W.'s testimony regarding the location of Sundling's alleged molestation of A.W. However, B.W.'s testimony merely established that A.W. and two other children were present at the [Super] Motel 8 in LaGrange, Indiana at the time B.W. was molested. Thus, although the prosecuting attorney may have established that A.W. was present in the motel rooms during the molestation of B.W., the record is devoid of any evidence that Sundling also molested A.W. at the Super 8 Motel in Indiana. Specifically, neither B.W. nor A.W. testified that Sundling molested A.W. while at the motel in Indiana. To the contrary, A.W. testified that Sundling did not touch him at the Super 8 Motel in Indiana, but at a house in Sturgis, Michigan. Therefore, we must reverse and dismiss Sundling's conviction for molestation of A.W. for lack of territorial jurisdiction.

*Id.* at 991-92. As just discussed, this is not a case where "no evidence" supports territorial jurisdiction.

[8] Mendenhall also argues that the evidence is insufficient to prove venue in Marion County. But because we concluded above that the evidence is sufficient to prove beyond a reasonable doubt that Purpura was killed at the Flying J in Indianapolis, which is in Marion County, we find that the evidence is sufficient to prove venue in Marion County by a preponderance of the evidence. *See* I.C. § 35-32-2-1(c).

[9] Mendenhall doesn't make any Fourth Amendment arguments concerning the search of his semi-truck, as the Tennessee courts have already addressed those arguments.

standard of appellate review is de novo." *Ackerman v. State*, 51 N.E.3d 171, 177 (Ind. 2016) (quotation omitted).

[25] Under the Fourth Amendment, a person's valid consent to a search generally eliminates the need for a search warrant. *M.D. v. State*, 108 N.E.3d 301, 304 (Ind. 2018). However, the Indiana Supreme Court has held that the Indiana Constitution offers "broader protections" for individuals consenting to a search. *Id.* Under *Pirtle*, before obtaining consent to search a home or vehicle, "police must explicitly advise a person in custody of [their] right to consult with counsel." *Id.*; *see also McCoy*, 193 N.E.3d at 391 ("*Pirtle* applies when a person (1) is in custody and (2) is asked by police to consent to a home or vehicle search."). Absent a *Pirtle* warning, "any evidence recovered during that search must be suppressed at trial." *McCoy*, 193 N.E.3d at 390. *Pirtle* is "unique" and has "no federal counterpart." *M.D.*, 108 N.E.3d at 304. The principle behind *Pirtle* is to "protect people from the most serious intrusions into privacy." *Garcia-Torres v. State*, 949 N.E.2d 1229, 1238 (Ind. 2011); *see also M.D.*, 108 N.E.3d at 306 ("[O]ur concern in *Pirtle*, and in the ensuing cases, was that consent to certain weighty intrusions carries a great risk of involuntariness.").[10]

[26] Mendenhall argues that "*Pirtle* applies even when the evidence was collected outside" of Indiana. Appellant's Br. p. 21. He claims that "[p]olice in Tennessee may not be bound by Indiana law, but Indiana courts are." *Id.* In support, he

---

[10] For example, *Pirtle* doesn't apply to pat-downs for weapons, buccal swabs, breath tests, blood draws, field-sobriety tests, or drug-recognition exams. *See Owens v. State*, 246 N.E.3d 1256, 1262 (Ind. Ct. App. 2024).

cites *Stidham v. State*, 608 N.E.2d 699 (Ind. 1993). In 1991, 17-year-old Stidham and his friends committed murder (and other crimes) in Indiana, visited friends "whom they told of the killing," and then drove to Illinois, where they were arrested. *Id.* at 700. "After contacting police officers in Indiana, the Illinois officers proceeded to Mirandize and question" Stidham without a parent or other representative present, and he confessed. *Id.* Contrary to Illinois law, Indiana law provided that a juvenile's constitutional rights could only be waived by the juvenile's custodial parent, guardian, custodian, or guardian ad litem if certain requirements were met. I.C. § 31-6-7-3(a) (1992) (now codified at I.C. § 31-32-5-1(2)).[11] Indiana law also provided that if those requirements were not met, the juvenile's statement was not admissible as substantive evidence at trial. I.C. § 31-6-7-3(c) (1992) (now codified at I.C. § 31-32-5-3).

[27] On appeal, Stidham argued that the trial court erred in admitting his confession into evidence. Our Supreme Court agreed:

> Under Illinois law, the police were not required to have a parent or guardian present when they obtained [Stidham's] statement. However, the introduction in evidence of a statement made by a person under eighteen years of age is forbidden by statute, Ind. Code § 31-6-7-3, unless counsel representing the child, or the child's custodial parent, guardian, or guardian *ad litem* is present and the child's representative and the child waive his right to remain silent. . . .

---

[11] Section 31-6-7-3(a) also provided that a juvenile's constitutional rights could be waived by the juvenile's attorney if the juvenile joined, but that provision was not at issue in *Stidham*.

> The State argues that since the statement of [Stidham] was lawfully obtained in Illinois it could be introduced in evidence in Indiana. The issue here is not the issue of the lawfulness of the Illinois confession. There is no question that it in fact was taken lawfully. The question is the admissibility of that statement obtained in Illinois in a prosecution taking place in Indiana.
>
> We are fully aware of the cases cited by the State wherein other jurisdictions have held that in situations such as this, the statement would be admissible in the prosecuting state. *See State v. Toone* (1992), Tex. App., 823 S.W.2d 744; *Tarawneh v. State* (1990), Fla. App., 562 So. 2d 770; *People v. Accardo* (1990) 195 Ill. App. 3d 180, 141 Ill. Dec. 821, 551 N.E.2d 1349; *State v. Mollica* (1989), 114 N.J. 329, 554 A.2d 1315; *Pooley v. State* (1985), Alaska App., 705 P.2d 1293; *People v. Blair* (1979), 25 Cal. 3d 640, 159 Cal. Rptr. 818, 602 P.2d 738. However, to the extent that those cases would permit introduction of a statement under circumstances similar to those in this case, we reject their authority.

*Id.* at 700-01. Accordingly, the Court reversed Stidham's convictions and remanded the case for a new trial.

[28] The State argues that *Stidham* doesn't control here. It highlights that, "[u]nlike *Stidham*, . . . there is no evidence that officers from Indiana and Tennessee were in contact prior to obtaining Mendenhall's consent to search his semi-truck. There is no evidence that Indiana officers participated in any way in obtaining Mendenhall's consent to search." Appellee's Br. p. 31. That is, when Sergeant Postiglione asked Mendenhall for consent to search his semi-truck in Tennessee, he was investigating a Tennessee case and had no idea that a potential crime in Indiana was involved. The Indianapolis police were only

contacted **after** Mendenhall consented to the search and evidence that Purpura may have been killed was discovered.

[29] We agree with the State that this difference matters. We acknowledge, as Mendenhall points out, that our Supreme Court's analysis in *Stidham* did not explicitly rely on the fact that the Illinois police contacted the Indiana police before questioning Stidham without a parent or other representative present. *See* Appellant's Reply Br. pp. 10-11. But that is how the case unfolded. The Court recognized that the majority approach is that the law of the state where the search is conducted governs admissibility of the evidence. *See, e.g.*, *State v. Boyd*, 992 A.2d 1071, 1084-85 (Conn. 2010). But it did not apply that approach given the "circumstances" of the case. And those circumstances are that the Illinois police interviewed a juvenile from Indiana in connection with an Indiana murder—without a parent or other representative present in violation of Indiana law—only after contacting the Indiana police. Those circumstances are not present here. When Sergeant Postiglione asked Mendenhall for consent to search his semi-truck in Tennessee, he had no idea that an Indiana crime was implicated, and the Indianapolis police were only contacted after the fact. *Stidham* therefore doesn't control. The trial court did not err in admitting evidence stemming from the July 12, 2007 search of Mendenhall's semi-truck in Tennessee.

[30] Affirmed.

Bradford, J., and Altice, J., concur.

ATTORNEY FOR APPELLANT

Casey Farrington
Marion County Public Defender Agency
Indianapolis, Indiana


ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General

Michelle Hawk Kazmierczak
Deputy Attorney General
Indianapolis, Indiana